AO 91 (Rev. 11/11) Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
4/2/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: JB  DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
APR - 2 2021
CENTRAL DISTRICT OF CALIFORNIA
BY: DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| RONALD MCCREA, JR., and DAVEON BAKER, | ) ) ) ) ) | Case No. 2:21-mj-01589-DUTY |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 1, 2021__ in the county of __Los Angeles__ in the __Central__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

Please see the attached affidavit.

☑ Continued on the attached sheet.

/s/
Complainant's signature

Michael Woodard, DEA TFO
Printed name and title

Sworn to before me *telephonically* and signed in my presence.

Date: 04/02/2021

Judge's signature

City and state: Los Angeles, CA

Hon. Karen L. Stevenson USMJ
Printed name and title

AUSA: Gregg E. Marmaro

**AFFIDAVIT**

I, Michael Woodard, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Ronald MCCREA, Jr. ("MCCREA") and Daveon BAKER ("BAKER") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Controlled Substances.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices seized on April 1, 2021, and currently in the custody of the Drug Enforcement Administration in Los Angeles, California, as described below and in Attachment A (the "SUBJECT DEVICES"):

   a. An IPhone 7 Plus, bearing serial number FCCC43C0HG00 and IMEI number 359473086560048, seized from MCCREA ("SUBJECT DEVICE 1"); and

   b. An LG Aristo 3 phone, bearing serial number 901CYPY0438120 and IMEI number 352533104301209, seized from BAKER ("SUBJECT DEVICE 2").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Detective with the Los Angeles Airport Police Department ("LAXPD") and have been so employed since 2003.  I am currently assigned as a Task Force Officer ("TFO") to the DEA Narcotics Task Force at the Los Angeles International Airport (the "LAX Narcotics Task Force" or the "Task Force"), which investigates criminal enterprises that use the aviation system to transport large amounts of illicit drugs throughout the United States and the world.  The Task Force consists of law enforcement officers from the DEA, the Los Angeles World Airports Police Department, the Los Angeles Police Department, and the Los Angeles County Sheriff's Department.  I have served on the Task Force since 2012.

6.   As a TFO, I have been involved in over 1,000 drug-related investigations, including numerous investigations involving drugs being trafficked through the aviation system.  In these investigations, I have participated in the execution of

search warrants, conducted physical surveillances, reviewed video surveillance, spoken to confidential informants, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers. I am familiar with the ways in which drug smugglers and bulk cash smugglers use digital devices to facilitate and conceal their criminal activities.

### III. SUMMARY OF PROBABLE CAUSE

7. On April 1, 2021, a TFO with the LAX Narcotics Task Force observed MCCREA, a uniformed Transportation Security Administration ("TSA") agent, pass three objects, later determined to be several kilograms of various narcotics, to BAKER, a suspected narcotics courier, under an adjacent bathroom stall in a bathroom near Gate 150 in the Tom Bradley International Terminal at LAX. BAKER was scheduled to fly to Indianapolis, Indiana, with a connecting flight in Charlotte, North Carolina, out of a separate terminal.

8. Based on initial testing of the suspected controlled substances, the objects tested positive for methamphetamine (11.23 kilograms, with packaging), cocaine (1.22 kilograms, with packaging), and heroin (1.08 kilograms, with packaging).

9. In a Mirandized interview, MCCREA admitted to the narcotics transaction. MCCREA stated that this was the third time he had used his security access as a TSA agent to facilitate a narcotics transaction, for which he would be paid $3,000 per transaction.

10. In a Mirandized interview, BAKER admitted to receiving packages from MCCREA in the bathroom. BAKER said he would be paid $2,500 to transport the packages from LAX to Indianapolis, with a final destination of Louisville, Kentucky. BAKER stated that this was the first time he had done this.

11. MCCREA and BAKER consented to searches of the cell phones that were recovered from their persons, SUBJECT DEVICE 1 and SUBJECT DEVICE 2, respectively.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my own involvement in and knowledge of the investigation, as well as my review of law enforcement reports and my conversations with other law enforcement agents, I am aware of the following:

### A. LAX Narcotics Task Force Officers Establish Surveillance After Learning that BAKER, a Suspected Narcotics Courier, Is Scheduled to Fly to Indianapolis

13. On or about March 31, 2021, I learned from DEA agents in Louisville, Kentucky that BAKER, a suspected narcotics courier, was scheduled to fly the next day at 1:44 p.m. on an American Airlines flight from LAX to Indianapolis, Indiana with a connecting flight in Charlotte, North Carolina. BAKER's flight was scheduled to depart from Gate 48 in LAX's Terminal 4.

14. On April 1, 2021, I, along with other LAX Narcotics Task Force officers, set up surveillance of the American Airlines ticket counter lobby in Terminal 4 to observe BAKER upon his arrival.

### B. BAKER Is Observed Checking In For Flight to Indianapolis

15. At approximately 1:05 p.m., a male, later identified as BAKER, was seen in the American Airlines ticket lobby area with a black roller bag suitcase while talking on his cell phone. The black suitcase appeared to be light.

16. BAKER, who looked lost or confused about where to go, was within 15 minutes of his flight's boarding time and had not gone through TSA security screening. After a few minutes, BAKER left Terminal 4 and began walking towards Terminal 5, and then reversed his direction less than a minute later, continued past Terminal 4, and entered the Tom Bradley International Terminal.

### C. After Going Through Security, BAKER Enters Bathroom and Is Followed by MCCREA, a Uniformed TSA Agent

17. After entering the International Terminal, BAKER went through TSA security screening without incident. Task force officers continued to follow BAKER and observed him enter the men's bathroom near Gate 150.

18. A short time later, another individual, later identified as MCCREA, a uniformed TSA agent, entered the same men's bathroom.

### D. BAKER and MCREA Are Observed Exchanging Three White Objects Later Determined to Be Various Narcotics

19. LAX Narcotics Task Force officer Victor Moore entered the bathroom and could see that only two of the stalls were occupied. The two stalls were side-by-side, divided by a partial wall. Each stall appeared to be occupied by one person.

20. Deputy Moore saw that both occupants' shoes were facing each other, towards the wall dividing the two stalls, instead of facing the front or back of their respective stalls. Deputy Moore saw, on the floor of one stall, a black suitcase matching the one with which BAKER had been observed. Deputy Moore also saw, on the floor of the adjacent stall, another black bag.

21. Deputy Moore then observed what appeared to be an exchange of at least three white objects under the dividing wall between the two stalls.

22. Shortly thereafter, BAKER and MCCREA left the bathroom. Task force officers separately encountered and stopped MCCREA and BAKER.

23. BAKER consented to a search of his black roller bag. Inside the bag, task force officers recovered three brick-shaped objects containing suspected narcotics.

24. BAKER claimed that the white crystal-like substance in his bag was "pool salt."

### E. In Mirandized Interviews, MCCREA and BAKER Admit to Transaction and Consent to Searches of the SUBJECT DEVICES

25. MCCREA and BAKER were transported to the LAX Narcotics Task Force office.

26. MCCREA waived his Miranda rights and made the following statements:

    a. MCCREA admitted to giving narcotics to BAKER.

    b. MCCREA said that this was the third time he had used his security access to bring narcotics into the airport,

which he would give to an airline passenger who had already cleared screening and who was working as a narcotics courier. MCCREA said that he would receive $3,000 per transaction.

       c. MCCREA signed a consent form for the search of his cell phone (SUBJECT DEVICE 1), found on his person, and provided the agents with the pin number to unlock the phone.

    27. BAKER waived his Miranda rights and made the following statements:

       a. BAKER admitted to receiving packages from MCCREA in the bathroom. BAKER said he would be paid $2,500 to transport the packages from LAX to Indianapolis, with a final destination of Louisville, Kentucky. BAKER stated that this was the first time he had done this.

    28. BAKER signed a consent form for the search of his cell phone (SUBJECT DEVICE 2), found on his person, and provided the agents with swipe access to unlock the phone.

    **F.   Suspected Narcotics Test Positive for Methamphetamine, Cocaine, and Heroin**

    29. At the LAX Narcotics Task Force office, Special Agent Norman Tobias tested the three packages of suspected narcotics found in the black suitcase. Utilizing the Thermo Scientific TruNarc Raman spectrometer, SA Tobias found that one package contained a crystalline substance that tested positive for methamphetamine (11.23 kilograms, with packaging); another package tested positive for cocaine (1.22 kilograms, with packaging); and the third package tested positive for heroin (1.08 kilograms, with packaging).

30. Also at the LAX Narcotics Task Force office, a K-9 sniff was conducted on MCCREA's backpack, and it alerted to a positive trace for narcotics.

## V. TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

31. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Los Angeles is a major hub for drug distribution. Partly because of the close proximity of Los Angeles to the Mexican border, prices of drugs are generally lower here than prices on the east coast. Drugs enter Los Angeles from across the Mexican border or overseas from Asia and are then distributed across the country. LAX is commonly used to facilitate drug transportation for Drug Trafficking Organizations, who send their couriers through LAX with drugs in their luggage. Numerous drug arrests are made at LAX every year, with couriers transporting drugs in checked bags.

   b. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   c. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the

8

manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

        d.    Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales. It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods. Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

e.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

f.  It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

32.  In the case of drug couriers, cell phones or digital devices are also commonly used to communicate itineraries to couriers and provide directions to couriers along their route and once they arrive at their destination.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

34. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

11

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

 c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

 d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

35. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

 a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.      Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

36.     The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.      Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.      In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an

enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Ronald MCCREA's and Daveon BAKER's thumbs- and/or fingers on the device(s); and (2) hold the device(s) in front of Ronald MCCREA's and Daveon BAKER's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

 37. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

## VII. CONCLUSION

38. For the reasons described above, there is probable cause to believe that MCCREA and BAKER have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute Controlled Substances. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
April, 2021.

_____
HONORABLE KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE